FILED

NOV 19 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1 | **Diane Fisher**
1349 Hearst Avenue
2 | Berkeley, California 94702
Tel: 510-575-0563

3 | **Staci Prado**
1349 Hearst Avenue
4 | Berkeley, California 94702
Tel: 510-575-0563

5 | **Mark Tayne**
1349 Hearst Avenue
6 | Berkeley, California 94702
Tel: 510-575-0563

7 |
*Pro Se Plaintiffs*

8 |                    **UNITED STATES DISTRICT COURT**

9 |                  **NORTHERN DISTRICT OF CALIFORNIA**

10 | DIANE FISHER, STACI PRADO AND MARK
TAYNE,                                    Case No. **C24-08134 CRB**

11 |          Plaintiffs,                  **COMPLAINT FOR INJUNCTIVE RELIEF**

12 |      vs.

13 | CITY OF BERKELEY, PAUL
BUDDENHAGEN, PETER RADU, OKEYA
14 | VANCE-DOZIER, DOES 1-10

15 |          Defendant.

Plaintiffs DIANE FISHER, STACI PRADO and the MARK TAYNE ("Plaintiffs") complain and allege as follows:

## INTRODUCTION

1. Plaintiffs bring this case asking the court to protect them from the City of Berkeley, which is violating the Americans with Disabilities Act ("ADA") by failing to follow its own ADA policies and by neglecting to engage in the interactive process required under the law. Furthermore, the City's actions constitute retaliation against the Plaintiffs for exercising their First Amendment rights, as they are actively protesting for their civil rights and housing justice. By targeting their protest encampments, the City is not only suppressing their freedom of speech but also infringing upon their right to freedom of association, as these encampments serve as hubs for mutual support and collective advocacy. Plaintiffs seek the court's intervention to prevent further violations of their civil rights.

2. Plaintiffs ask the court to temporarily stop defendant CITY OF BERKELEY ("Defendant") from evicting unhoused Berkeley residents from the protest encampment at Ohlone Park, Old City Hall, the Corporation Yard and 4th and Bancroft Streets because unhoused residents will face unlawful property loss, state created danger, and violations of their disability-related rights and freedom of speech and association if the eviction proceeds.

3. Since the US Court's last order in *Prado v. City of Berkeley*, 23-cv-04537-EMC (N.D. Cal. Aug. 6, 2024) situations have developed for unhoused people in the City of Berkeley. Plaintiffs in the *Prado* case have engaged in expressive conduct protesting the City of Berkeley's anti-homeless policies. One policy in particular was recently passed on September 24, 2024, with the vote of all the Berkeley city council members

and Mayor Arreguin. The new encampment policy outlines specific criteria under which the City of Berkeley can abate and close encampments. In the resolution, the City affirmed its commitment to comply with the 2018 Martin v. Boise ruling, which restricts the enforcement of anti-camping ordinances unless adequate shelter is available. However, the City amended Chapter 14.48 of the Berkeley Municipal Code, titled Miscellaneous Use of Streets and Sidewalks, to create six specific exceptions that allow for the removal of encampments under certain conditions.

4. On Wednesday, November 13 to the 15, 2024, Defendant posted notices stating that Plaintiffs and their neighbors in their protest encampments had to pack their belongings and leave immediately, but there were no posting of eviction notices for similarly situated encampments in the City. PLAINTIFFS Diane Fisher, Staci Prado, and Mark Tayne are members of these protest encampments. Similarly, many unhoused residents living in these encampments are disabled, elderly and highly vulnerable. If this closure proceeds as noticed, residents will suffer numerous harms.

5. Plaintiffs are disabled individuals, who rely on their tents and encampment setups for safety, shelter, community and essential accommodations, and the removal of these will likely lead to the rapid deterioration of their physical and mental health. Forced displacement will expose residents to unsafe conditions, including an atmospheric river storm and cold weather, which poses significant risks to elderly individuals and those with chronic illnesses such as diabetes, arthritis, or cardiovascular conditions. Many residents, due to physical disabilities or mobility limitations, lack the ability to pack their belongings or move their possessions without assistance, putting them at risk of losing critical items such as medications, identification, and mobility aids,

which are often irrecoverable as the City does not consistently store unhoused people's property, and these items are essential to their well-being.

6. The forced removal will also disrupt the stability of those participating in organized protests, violating their rights to free speech and association, and will leave unhoused residents without access to nearby mutual aid, bathrooms, charging stations, and essential resources. Additionally, the stress and uncertainty caused by forced removal will exacerbate mental health conditions like PTSD, anxiety and depression, destabilizing even further their already precarious lives. Proceeding with this encampment closures without providing proper accommodations or alternative housing options will cause irreparable harm to the health, safety, and rights of these unhoused residents.

7. The organization Where Do We Go?, has collaborated with unhoused residents and the Berkeley Homeless Union to organize ongoing expressive protests against Berkeley's anti-homeless policies. Together, they have established a network of protest encampments across the City to draw attention to these issues. This movement has gained international recognition as a significant and impactful protest of its time. [See Reporting: "California's unhoused people protest US supreme court order: 'Not going to push us out of view'" *The Guardian* (November 14, 2024): https://www.theguardian.com/us-news/2024/nov/14/california-berkeley-unhoused-protest]

8. Over the years, unhoused Berkeley residents have endured repeated evictions by the City of Berkeley, each one causing immense harm. These evictions have led to the loss of essential possessions such as RVs, trailers, cars, tents, makeshift shelters, survival gear, medical equipment, tools, and other items critical to their daily

survival. [See Reporting: 'Everything Is Gone, and You Become More Lost': 12 Hours of Chaos as Berkeley Clears Encampment" *San Francisco Public Press* (December 22, 2022): https://www.sfpublicpress.org/everything-is-gone-and-you-become-more-lost-12-hours-of-chaos-as-berkeley-clears-encampment/]. These belongings are often irreplaceable due to financial constraints, leaving residents even more vulnerable to the elements and unable to meet basic needs. Beyond material losses, these evictions have caused community members to be displaced further into surrounding neighborhoods, forcing them to scatter and severing the connections that provide vital support. Each time, individuals are uprooted from their networks of mutual aid, friends, and loved ones, intensifying their isolation and instability.

9.  Disabled residents, in particular, suffer disproportionate harm to these type of city actions. They are not only more reliant on their possessions, such as mobility aids or medical devices, but also on the stability and support of their communities for survival. The repeated upheaval compounds their physical and emotional challenges, leaving them increasingly traumatized and less able to access life-sustaining resources.

10. The Defendant has notice of the disability related needs of Plaintiffs at the protest encampments that was issued by representatives of the Berkeley Homeless Union on Friday, November 15. Plaintiffs have been subject to evictions before and the City has failed to take into account accommodations for these disabilities.

11. In response, Plaintiffs bring this lawsuit seeking to stop Defendant from displacing the unhoused residents of Ohlone Park, Old City Hall, the Corporation Yard and 4th and Bancroft Streets until their disability-related needs for access to shelter and

preservation of their property have been met. Plaintiffs also seek to prevent Defendant from infringing on their constitutional rights to freedom of speech and association, as they are actively protesting the City of Berkeley's anti-homeless policies. These policies are the core issue being challenged through the protest encampments, and the City's actions to displace residents directly undermine their ability to advocate for systemic change and assert their rights.

12. Plaintiffs therefore request that the Court enter a temporary restraining order preserving the status quo at the protest encampments at Ohlone Park, Old City Hall and the Corporation Yard and 4th and Bancroft Streets, so that that they may have an opportunity to present their case for fuller relief, including a request for a preliminary injunction that will protect them from the imminent and irreparable injuries they face.

### JURISDICTION AND VENUE

13. Plaintiffs' claims arise under the laws and Constitution of the United States, including 42 U.S.C. § 12132 and 42 U.S.C. § 1983. Therefore, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

14. The Federal Rules of Civil Procedure 57 and 65, authorize this Court to grant Plaintiffs the injunctive relief they seek here. An award of attorneys' fees is authorized pursuant to 42 U.S.C. § 1988(b).

15. This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs' state law claims share common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiffs' federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

16. Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because defendant CITY OF BERKELEY is located in this district and a substantial part of the events and/or omissions were committed in this district.

17. Because the events and omissions giving rise to Plaintiffs' claims occurred in Alameda County, this case should be assigned to the Northern District's Oakland or San Francisco Division, pursuant to N.D. Cal. L.R. 3-2(d).

## **THE PARTIES**

18. PLAINTIFF DIANE FISHER is an individual with a qualified disability under the Americans with Disabilities Act, namely diabetes. Ms. Fisher is 40-years-old and a Caucasian woman. She is a union member of the Berkeley Homeless Union. Ms. Fisher suffers from uncontrolled seizures occurring multiple times daily, severe arthritis due to a congenital condition, and memory loss resulting from a traumatic brain injury in 2018. Additionally, Diana lives with dissociative identity disorder that developed at the age of 9-years-old, which makes tasks like completing paperwork or deconstructing her tent nearly impossible without assistance. Her disabilities require specific accommodations, and she is unable to comply with the City's directives without risking her health and safety. She has been experiencing homelessness for 3 years.

19. Mailing Address: 1349 Hearst Avenue Berkeley, CA 94702

20. Email: berkeleypeoplepower@gmail.com

21. PLAINTIFF STACI PRADO is a 60-year-old woman and a dedicated union member of the Berkeley Homeless Union. She is a stroke survivor living with multiple severe medical conditions, including scoliosis, coronary artery disease, spontaneous

coronary artery dissection (SCAD), atrial fibrillation, sciatica, high blood pressure, severe malabsorption, anemia, and malnutrition. These conditions significantly limit her mobility and leave her at a heightened risk of severe health complications, including heart attacks, which could be triggered by physical exertion or stress. Despite these challenges, Ms. Prado has found stability and support at the Corporation Yard encampment, where she has access to a tent for shelter, nearby porta potties, food, and a supportive community. She is now facing imminent eviction, which would strip her of these essential resources, putting her health and safety at grave risk. She has been experiencing homelessness for 17 years.

22. Mailing Address: 1349 Hearst Avenue Berkeley, CA 94702

23. Email: berkeleypeoplepower@gmail.com

24. PLAINTIFF MARK TAYNE is a 64-year-old African American man and a union member of the Berkeley Homeless Union. He has a qualified disability under the Americans with Disabilities Act (ADA), specifically diabetes, which has led to severe health complications, including the amputation of several toes. These mobility challenges require him to use a wheelchair for transportation. Mr. Tayne is currently facing imminent eviction from the Old City Hall encampment, where he has sought stability, community support, and access to essential resources. His displacement would exacerbate his health conditions and deprive him of the accommodations necessary for his survival and well-being. He has been experiencing homelessness for 7 years.

25. Mailing Address: 1349 Hearst Avenue Berkeley, CA 94702

26. Email: berkeleypeoplepower@gmail.com

**COMPLAINT FOR INJUNCTIVE RELIEF**

27. Defendant CITY OF BERKELEY is a municipal corporation organized under the laws of the State of California.

28. Defendant PAUL BUDDENHAGEN is the City Manager of the City of Berkeley who perpetrates a policy of evicting unhoused disabled Plaintiffs without observing the City of Berkeley's own ADA policies.

29. Mailing Address: 2180 Milvia St, Berkeley, CA 94704

30. Email: pbuddenhagen@berkeleyca.gov

31. Defendant PETER RADU is an assistant to the City Manager of the City of Berkeley who perpetrates a policy of evicting unhoused disabled Plaintiffs without observing the City of Berkeley's own ADA policies.

32. Mailing Address: 2180 Milvia St, Berkeley, CA 94704

33. Email: pbuddenhagen@berkeleyca.gov

34. Okeya Vance-Dozier is the field supervisor of the Berkeley Homeless Response Team who perpetrates a policy of evicting unhoused disabled Plaintiffs without observing the City of Berkeley's own ADA policies.

35. Mailing Address: 2180 Milvia St, Berkeley, CA 94704

36. Email: pbuddenhagen@berkeleyca.gov

37. DEFENDANTS DOES 1-10 are public and private parties who are currently unknown to Plaintiff, but will be added in by amendment of the complaint.

## FACTUAL ALLEGATIONS

A. **Plaintiffs Face Imminent Harm Due to the City's Failure to Provide Disability Accommodations and Shelter Alternatives**

38. Ms. Fisher resides at Ohlone Park and suffers from multiple daily seizures caused by a traumatic brain injury (TBI) [Decl. Fisher, ¶6]. Her TBI also causes significant

memory loss, with her often forgetting information within two to three hours [Decl. Fisher, ¶7]. Additionally, she suffers from dissociative identity disorder stemming from early childhood trauma, resulting in 29 distinct identities [id., ¶8]. Ms. Fisher also has learning disabilities that make it impossible for her to understand written notices [id., ¶9]. These conditions make living on the streets extraordinarily difficult for her.

39. Despite these challenges, the City of Berkeley has now informed Ms. Fisher that she cannot camp in the one location where she has access to a portable bathroom, a supportive community, and donations of food and water. Through her representatives in the Berkeley Homeless Union, Ms. Fisher has requested to engage in the disability accommodation process [id., ¶7]. However, the City's ADA Coordinator is unavailable until December 2, 2024. [See Decl. Gilmore]. On Monday, November 18, the Berkeley Homeless Union has also requested a walk-through of the encampments to assess the disability accommodations needs for all residents living there, but the City has not responded to date despite the immediate notice of eviction. [See Decl. Yesica Prado]

40. Ms. Prado, who resides at the Corporation Yard encampment, is a stroke survivor with multiple severe medical conditions, including scoliosis, coronary artery disease, spontaneous coronary artery dissection (SCAD), sciatica, and secondary Raynaud's disease [Decl. Staci Prado]. She has also survived heart attacks and, due to her SCAD and coronary disease, faces an elevated risk of death from strenuous movement or emotional stress [id. ¶18].

41. The City has similarly informed Plaintiff Ms. Prado that she cannot camp in the one location where she has access to a bathroom, community, and donations of food and

water. Ms. Prado has requested to engage in the disability accommodation process through her representatives in the Berkeley Homeless Union, but like Ms. Fisher, she faces delays because the City's ADA Coordinator is unavailable until December.

42. Due to her SCAD and coronary artery disease, Ms. Prado faces an elevated risk of fatal heart attacks, particularly from physical exertion or emotional stress. Her sciatica and scoliosis further restrict her mobility, making it difficult or impossible to carry heavy objects or walk long distances. Severe malabsorption, anemia, and malnutrition exacerbate her physical frailty, leaving her with limited energy and heightened vulnerability to health complications.

43. The City's decision to evict Ms. Prado from the encampment would force her to lose access to the resources she relies on for survival, including a portable bathroom, supportive community of housed and unhoused neighbors alike, and regular donations of food and water. These resources are critical for her to manage her health conditions, particularly malnutrition and anemia. Eviction would also place her under extreme physical and emotional stress, further increasing her risk of life-threatening cardiovascular events. [id. ¶18].

44. Without stable shelter or accommodations, Ms. Prado would face grave and immediate harm, as she cannot safely relocate or endure the physical and emotional toll of displacement. Her medical conditions necessitate a stable, low-stress environment with access to basic resources, none of which the City has offered as an alternative.

45. Plaintiff Mr. Tayne, who resides at the Old City Hall encampment, is a disabled individual living with lifelong anemia and severe mobility challenges. In 2019, complications from diabetes led to the amputation of all the toes on his feet, leaving

him unable to walk without losing his balance. To navigate his daily life, Mr. Tayne relies on a wheelchair, which is an essential tool for his mobility and independence. Without it, he cannot access vital resources, manage his health needs, or move safely. [Decl. Tayne, ¶4]

46. Mr. Tayne moved to the Old City Hall encampment because it offers resources and a sense of stability that he lacked when sleeping on a bench in Civic Center Park. At the protest encampment, he was provided with a tent that gives him comfort and protection from the elements, which is critical given his compromised health. He also has access to food and a supportive community of people who assist him when needed. Importantly, porta potties are located close to his tent, minimizing the physical strain and risks associated with traveling longer distances to meet his basic needs. The encampment also allows him to advocate for equitable treatment and protest for his civil rights while maintaining access to the essentials he needs to survive.

47. Mr. Tayne desires to move indoors, but he has not been offered accessible shelter accommodations. The Dorothy Day House shelter, where he previously stayed and it's in the area, required him to leave before 6 a.m. each morning. Its resources, including bathrooms, remain closed during the day until the shelter reopens in the evening, leaving him without access to essential facilities for most of the day. For someone with his health conditions and mobility limitations, such arrangements are unsuitable and unsafe. [id. ¶7].

48. If forcibly evicted, Mr. Tayne would lose his tent and other critical belongings, leaving him exposed to the elements during an atmospheric river storm predicted this week and as winter approaches, with the cold already being felt. Without shelter or

his essential possessions, Mr. Tayne would face severe risks to his health, including hypothermia, exacerbation of his anemia, and the inability to manage his diabetes. Such circumstances could be life-threatening. The forced displacement would strip him of the stability and resources that currently sustain him, placing him in grave peril. [id. ¶16].

**B. Berkeley's 2024 Encampment Policy**

49. On September 10, 2024, Rashi Keserwani, District 1 councilwoman, introduced a new encampment policy that established criteria for the city of Berkeley to abate and close encampments. In the resolution, the City stated that they would abide by the ruling of Martin v Boise 2018 unless certain criteria were met by the encampments, for which City amended Chapter 14.48 of the Berkeley Municipal Code, *Miscellaneous Use Of Streets And Sidewalks*, to allow for six specific exceptions to this practice, which are the following:

- "The Fire Department has determined that an encampment poses a fire hazard or emergency condition as referenced in the Berkeley Fire Code, Berkeley Municipal Code (BMC) Chapter 19.48; or

- The Environmental Health Division of the Health, Housing and Community Services Department has determined that the encampment poses an imminent health hazard as defined in BMC section 11.36.030; or

- The City has determined that a situation constitutes a public nuisance as defined in the BMC and is subject to an abatement pursuant to the BMC; or

- The encampment is located on a City street median, in the roadway, or otherwise in dangerous proximity to traffic pursuant to BMC section 14.32.040; or

**COMPLAINT FOR INJUNCTIVE RELIEF**

- The encampment is located in an area where the City has authorized work (such as for construction, major or minor encroachments, etc.) pursuant to BMC section 13.36.045; or
- The encampment interferes with or impedes city or utility companies' construction or maintenance activities in the public right-of-way, street lighting installation or repair, street tree maintenance, or utilities maintenance or repair.

50. On September 24, 2024, the resolution was passed with the vote of all the Berkeley city council members and Mayor Arreguin. The new encampment policy would become effective 30 days after this date. According to a city report, the policy authorizes the City Manager "to take enforcement actions to deter re-encampment (after clearing an encampment involving any of the six instances enumerated above) through such means as hardscaping; signage that references state Penal Code Section 647(e)3 ; or citation and arrest, even if a shelter offer cannot be made.

51. On October 7, 2024, Paul Budenhagen, City Manager for the city of Berkeley, wrote a memo clarifying how the city would implement the new Encampment Policy: "Even if an encampment meets one of the health and safety exceptions enumerated in the resolution, staff will resort to enforcement only if all other service offers and attempts to achieve voluntary compliance have failed. Because encampments are comprised of human beings, each with different needs and mental states, effectuating this process requires a case-by-case approach and is not subject to predictable timelines." But unhoused residents at these protest encampments have not been offered any shelter services.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Exposure to State-Created Danger**
**Under the Fourteenth Amendment to the U.S. Constitution**
**Pursuant to 42 U.S.C. § 1983**

52. Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

53. Governmental action that affirmatively places a person in a position of danger deprives that person of substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. *See* U.S. Const. amend. XIV.

54. Local governments violate the substantive due process rights of unhoused people when they place unhoused individuals in more vulnerable situations by confiscating the survival belongings that they use for shelter, warmth, and protection from the elements.

55. Defendant CITY OF BERKELEY has a policy, custom, and practice of removing unhoused people from public spaces and of seizing and destroying their personal property, such as tents and other survival gear, that is necessary for their protection. Defendant CITY OF BERKELEY engages in these practices without ensuring that shelter and/or housing options are available to unhoused individuals.

56. Without any other available option for shelter and without their vehicles, tents and survival gear—now destroyed—unhoused residents are forced to live exposed to the elements, without protection from heat, cold, wind, and rain. This severely jeopardizes their physical and mental health.

57. Defendant CITY OF BERKELEY's actions have placed Plaintiffs and others in a more dangerous situation than the one in which they were found and created and exposed them to a danger which they would not have otherwise faced.

58. Defendant CITY OF BERKELEY knows or should know that its actions endanger the health and safety of unhoused individuals, and defendant CITY OF BERKELEY has acted with deliberate indifference to this danger. Defendant CITY OF BERKELEY's conduct is shocking to the conscience and further imperils the health and safety of unhoused people.

59. Defendant CITY OF BERKELEY's policies and practices have and will continue to put Plaintiffs in immediate danger in violation of their substantive due process rights.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CAUSE OF ACTION
### Exposure to State-Created Danger
### Under Article I, § 7(a) of the California Constitution
### Pursuant to 42 U.S.C. § 1983

60. Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

61. Governmental action that affirmatively places a person in a position of danger deprives that person of substantive due process rights guaranteed by the California Constitution. Cal. Const. art. I, § 7(a). The substantive due process protections under the California Constitution are at least as expansive as those under the U.S. Constitution.

62. Defendant CITY OF BERKELEY's policy, custom, and practice of removing unhoused people from public spaces and of seizing and destroying their personal property, such as tents and other survival gear, endangers the health and safety of unhoused people in a way that shocks the conscience. Defendant CITY OF BERKELEY knows or should know that its actions endanger the health and safety of unhoused individuals.

63. Defendant CITY OF BERKELEY's policies and practices have and will continue to put Plaintiffs in immediate danger in violation of their substantive due process rights under the California Constitution.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION
**Property Destruction: Unreasonable Search and Seizure**
**Under the Fourth Amendment to the U.S. Constitution**
**Pursuant to 42 U.S.C. § 1983**

64. Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

65. The Fourth Amendment prohibits local governments from summarily seizing and destroying the personal property of unhoused individuals. *Garcia v. City of L.A.*, 11 F.4th 1113, 1124 (9th Cir. 2021) ("our prior caselaw states clearly that the government may not summarily destroy the unabandoned personal property of homeless individuals that is kept in public areas").

66. Defendant CITY OF BERKELEY has an unwritten policy, custom, and practice of seizing and destroying unhoused people's personal belongings. Defendant CITY OF BERKELEY destroys such property even if that property poses no threat to public health and does not constitute evidence of a crime.

67. Defendant CITY OF BERKELEY's policy, custom, and practice is to evict unhoused residents and, in the process, to destroy their belongings. Witnesses who have worked in the community for many years have observed the Department of Public Works demolishing people's shelters, confiscating their tents, and leaving people exposed to the elements. This has been done both in the pouring rain and in extreme heat. Witnesses have also observed employees of defendant CITY OF BERKELEY

destroying property even while the owners of that property have been telling them that it belongs to them and that they want to keep it.

68. Defendant CITY OF BERKELEY's unconstitutional policies and practices continue, subjecting Plaintiffs to persistent and imminent threat of having their personal property seized and destroyed in violation of the Fourth Amendment.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION
### Property Destruction: Unreasonable Search and Seizure
### Under Article I, § 13 of the California Constitution

69. Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

70. The California Constitution involves even greater protections than the Fourth Amendment with respect to property seizures. *See* Cal. Const. art. I, § 13.

71. Despite Defendant CITY OF BERKELEY's written policies to the contrary, it has an unwritten policy, custom, and practice of seizing and destroying unhoused people's personal belongings. Defendant CITY OF BERKELEY destroys such property even if that property poses no threat to public health and does not constitute evidence of a crime.

72. Defendant CITY OF BERKELEY's unconstitutional policies and practices continue, subjecting Plaintiffs to persistent and imminent threat of having their personal property seized and destroyed in clear violation of the more expansive protections under Article I, Section 13 of the California Constitution.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION
### Discrimination Against Persons with Disabilities
### Under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq.

73. Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

74. Title II of the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination under Title II of the ADA includes administration of programs in a way that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130 (b)(3)(ii).

75. A local government's removal of homeless individuals and their possessions from public property—as well as the provision of outreach, services, or shelter to unhoused individuals—are programs, services, and/or activities covered by Title II of the ADA.

76. Failure to provide proper assistance, additional time, or other support to disabled individuals when demanding that unhoused people remove themselves or their belongings from public space is a violation of the ADA.

77. Failing to provide shelter options to unhoused people that meet their disability needs is also a violation of the ADA because it means that shelter is functionally unavailable to them because of their disability.

78. Defendant CITY OF BERKELEY discriminates against unhoused individuals by failing to provide adequate notice, time, and assistance to unhoused people with disabilities who are forced to move themselves or their belongings from public space in response to defendant CITY OF BERKELEY's homeless sweeps.

**COMPLAINT FOR INJUNCTIVE RELIEF**

79. Forcibly removing unhoused residents without first identifying and offering alternative shelter or services that meet the individualized needs of people with disabilities does not serve any sufficiently compelling or bona fide and legitimate interest of defendant CITY OF BERKELEY, and less discriminatory options are available to defendant CITY OF BERKELEY to achieve any interests it claims it is trying to advance.

80. Plaintiffs DIANE FISHER, STACI PRADO AND MARK TAYNE have physical and mental disabilities and have been, and will be, injured by Defendant CITY OF BERKELEY's discriminatory response to unhoused residents with disabilities. Though Defendant is on notice of his disability-related needs because of prior accommodation requests he has made, he has made an additional request to this notice that has not been addressed. Members of the Berkeley Homeless Union living in the noticed area also have disabilities and have made accommodation requests that have not been addressed to date.

### SIXTH CAUSE OF ACTION
**Discrimination Against Persons With Disabilities**
**Under Cal. Gov. Code § 11135**

81. Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

82. Cal. Gov. Code § 11135 is intended to prohibit all forms of discrimination prohibited under Title II of the Americans with Disabilities Act and, where possible, to be more protective of people with disabilities. *See* Cal. Gov. Code § 11135(b).

83. By administering its programs for unhoused people and response to homelessness in a manner that has a discriminatory effect on people with disabilities, DEFENDANT CITY OF BERKELEY has violated, and continue to violate, Section 11135.

84. Plaintiffs DIANE FISHER, STACI PRADO AND MARK TAYNE have physical and mental disabilities and has been injured by Defendant CITY OF BERKELEY's discriminatory response to unhoused residents with disabilities. Members of the Berkeley Homeless Union living in the noticed area also have disabilities and have made accommodation requests that have not been addressed to date. WHEREFORE, Plaintiffs pray for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### 42 USC §1983 First Amendment Retaliation

85. "A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights."  Ariz. Students' Ass'n v. Ariz. Bd. of Regents, 824 F.3d 858, 867 (9th Cir. 2016).  "To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech."  Id.; Koala v. Khosla, 931 F.3d 887, 905 (9th Cir. 2019).

86. In Nieves v. Bartlett, 139 S.Ct. 1715 (2019). There, the Supreme Court held that, where a plaintiff brings a First Amendment retaliation claim based on a retaliatory arrest (similar to a retaliatory prosecution), the plaintiff must first plead and prove the absence of probable cause. Id. at 1724. "[I]f the plaintiff establishes the absence of probable cause, 'then . . . [t]he plaintiff must show that the retaliation was a

substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation.'" Id. at 1725; see also id. at 1722 ("It is not enough to show that an official acted with a retaliatory motive and the plaintiff was injured - the motive must cause the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."). However, if there is probable cause for an arrest, then, as a general matter, a claim for a retaliatory arrest must fail. See id. at 1727 ("[P]robable cause should generally defeat a retaliatory arrest claim ....").\

87. In the current case, Plaintiffs are engaging in constitutionally protected activity protesting the City of Berkeley's anti-homeless activities in their protest encampments supported by the organization Where Do We Go?

88. Starting November 12th, 2024 in the City of Berkely there were only about 8 camps with multiple tents in the City of Berkeley; four encampments were Harrison, 2nd Street, Dwight, Virginia; as well as four encampments participating in the Where Do We Go? Protest movement.

89. On or around November 12th, City of Berkeley under direction of Peter Radu, the City of Berkeley placed Notices to Vacate on all Where Do We Go? encampments, including Plaintiff's domicile located therein, but did not place similar notices on other encampments not protesting the City of Berkeley or not associated with Where Do We Go?

90. Plaintiff alleges that the notices to vacate the area were substantially caused by the First Amendment protected activities made by Plaintiff as a member of Where Do We Go?, which was evident pattern by the City of Berkeley's high level officials to

publicly derided Where Do We Go? protest activities based on animus by City of

Berkeley officials against Where Do We Go? and those who associate with them.

91. As applied to protest encampments, "All he has shown is that SPD officers decided

not to issue citations against protestors, including himself, at the Dunphy and Robyn

Sweeney Park protest campsites until they moved into the downtown area. These

individuals were still engaged in the same protected activity that he was, and

therefore, does not evidence differential treatment based on his protected speech."

*Powelson v. Sausalito Police Dep't*, 23-cv-01360-EMC (N.D. Cal. Nov. 8, 2023)

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

**Temporary Restraining Order:**

A.     Enter a Temporary Restraining Order to maintain the status quo until the Court has an

opportunity to hear a request for fuller relief, including a preliminary injunction, so that Plaintiffs

can demonstrate that there are serious questions going to the merits of their claims, and that the

balance of hardships tips sharply towards them since there is a likelihood of irreparable injury and an

injunction is in the public interest.

**Disability Accommodations Order:**

A.     Plaintiffs respectfully request that this Court issue an order requiring the City of

Berkeley to comply with its obligations under the Americans with Disabilities Act (ADA) and other

applicable laws by providing reasonable accommodations to unhoused individuals with disabilities

residing in the affected encampments. Plaintiffs seek relief to ensure that no further displacement or

confiscation of property occurs until the City engages in the required interactive process to assess

and provide appropriate accommodations for each individual's disability-related needs.

1        B.        Plaintiffs further request that the City identify and offer accessible and adequate

2 alternative shelter options that meet the specific requirements of disabled individuals, ensuring their

3 safety, stability, and access to necessary resources. Such relief is essential to protect the rights,

4 health, and dignity of Plaintiffs and others similarly situated.

**Injunctive Relief:**

5        A.        Grant a preliminary and permanent injunction enjoining and restraining defendant

6 CITY OF BERKELEY from seizing and disposing of homeless individuals' property in a manner

7 that violates the Fourth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 7(a)

8 and 13 of the California Constitution;

9        B.        Grant a permanent injunction enjoining and restraining defendant CITY OF

BERKELEY from removing unhoused people from public property and seizing their property, in the

10 absence of adequate housing or shelter, in violation of the Fourteenth Amendment to the U.S.

11 Constitution and Article I, § 7(a) of the California Constitution;

12        C.        Grant a permanent injunction enjoining and restraining defendant CITY OF

13 BERKELEY from actions that discriminate against people with disabilities in the administration of

14 its programs in violation of 42 U.S.C. § 12131 and Cal. Gov. Code § 11135;

**Other Relief:**

15        A.        Order defendant CITY OF BERKELEY to pay for Plaintiffs' attorneys' fees and

16 costs; and

17        B.        Grant Plaintiffs such further relief as the Court deems just and proper.

18

19 Dated: November 18, 2024

20

21                                    Respectfully submitted,

**COMPLAINT FOR INJUNCTIVE RELIEF**

## Verification

We the under signed Plaintiffs respectfully submit this complaint