IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIANE FISHER, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>CITY OF BERKELEY, et al.,<br><br>   Defendants. | Case No. 24-cv-08134-CRB<br><br>**ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER** |

Plaintiffs Diane Fisher, Mark Tayne, and Staci Prado are unhoused individuals with disabilities who live in Berkeley, California. They seek a temporary restraining order to prevent the City of Berkeley from displacing them from their encampments. For the following reasons, the Court **DENIES** their motion for emergency injunctive relief.

**I.   BACKGROUND**

   **A.   The Plaintiffs**

The Plaintiffs have all submitted declarations in support of their request for a temporary restraining order. Those declarations convey the following information:

**Plaintiff Mark Tayne** grew up in Oakland, California, where he was unhoused for a period of time. Tayne Decl. (dkt. 6-2) at 1. He then moved to Berkeley, where he briefly stayed at the Dorothy Day shelter, but ultimately left because they required him to wake up at 5:30 a.m. each day and did not provide him food that he could eat. Id. at 2. So he started sleeping on a bench in Civic Center Park (across from Old City Hall) until he joined a "protest camp" there on October 3, 2024, at which point he obtained a tent. Id. While living in Civic Center Park—where he still resides—the City posted a notice on his tent stating that he had to vacate the premises. Id. at 3. Tayne is diabetic and had toes

amputated on both his feet, so he has difficulty balancing while walking and uses a wheelchair. Id. at 2.

**Plaintiff Staci Prado** has lived in Berkeley for four years. Prado Decl. (dkt. 6-3) at 1. When she arrived in Berkeley, she briefly lived in an RV (which was stolen from her) and a car (which was towed by the City). Id. at 1–2. She lived in a tent in a camp at 2nd Street and Cedar Street for about a year, but she ultimately left due to a fear that the camp would be closed. Id. at 2. She joined a "protest encampment" at 4th Street and Bancroft Way on October 14, 2024. Id. She had lived there for "almost a month" when a notice was posted that the camp there would be closed. Id. So she moved again on November 13, 2024—this time to the City's corporation yard at 1313 Bancroft Way, which is where she still lives. Id. Once at 1313 Bancroft Way, the City posted a notice there stating that she would need to vacate. Id. at 3. Prado suffers from post-traumatic stress disorder and scoliosis, and she has experienced a stroke and two heart attacks. Id. at 4. She has turned down shelter housing before, though she states that this is because she is "a [domestic violence] survivor and [] cannot live with men." Id. at 3; Radu Decl. (dkt. 9) ¶ 7.

**Plaintiff Diane Fisher** moved from Iowa to Berkeley a year ago, and immediately upon arriving in Berkeley was unhoused. Fisher Decl. (dkt. 6-4) at 1. At some point, Fisher was staying at Old City Hall and was "swept" (i.e., evicted) by the City; she asserts that the City took her belongings so she could not recover them. Id. at 2. On October 23, 2024, she moved to Ohlone Park (where she still lives), as an advocacy organization called Where Do We Go? had set up camp. Id. The City has since posted a notice at Ohlone Park stating that anyone living there would have to vacate. Id. Though the notice said that anyone living there should be prepared to vacate, the City has not actually evicted anyone. Id. Fisher suffers from seizures, dissociative identity disorder, memory loss, and arthritis, and she states that she "only know[s]" to return to Ohlone Park. Id. at 3–4.

### B. The City of Berkeley

The City, for its part, responds with evidence as to its practices regarding unhoused people and encampments. The City explains that a "Notice to Vacate"—the type of

document that Tayne and Prado reported seeing—"is not a notice of closure or a threat of eviction." Radu Decl. ¶¶ 11, 20. Nor is a "Notice of Violation"—the type of document that Fisher reported seeing. Id. ¶ 14. Indeed, Peter Radu, an assistant to the City Manager, declares under oath that the City has no plans to evict Plaintiffs or anyone else from the sites at which Plaintiffs currently reside. Id. ¶¶ 12, 15, 21. The City indicates that it only has one eviction scheduled, which is set to take place at 4th Street and Bancroft Way (where Prado was living before she moved to 1313 Bancroft Way). Id. ¶ 8.

The City also explains that the encampment at Old City Hall, which is where Tayne currently lives, risks interfering with public efforts to address homelessness in Berkeley. Old City Hall does not function as government office space; rather, it is run "in partnership with Dorothy Day House as the Berkeley Emergency Storm Shelter (BESS). Under contract with the City, Dorothy Day House operates BESS to provide—among other things—shelter, meals, access to medical care, and housing support" for unhoused people. Id. ¶ 17. Leading up to the winter season, which begins on December 2, 2024, the City and Dorothy Day House "must perform work" to prepare BESS. Id. But the encampment at Old City Hall hinders this work, as tents prevent the installation of facilities and block access to the building (especially for individuals with disabilities). Id. ¶¶ 18–19.

Figure 1 is a diagram of the key locations at issue:

- Civic Center Park, where Plaintiff Mark Tayne currently resides, is marked by a blue circle.
- 1313 Bancroft Way, where Plaintiff Staci Pradi currently resides, is marked by a green dot.
- Ohlone Park, where Plaintiff Diane Fisher currently resides, is marked by a yellow square.
- Old City Hall, where the City and Dorothy Day House will operate BESS, is marked by a purple star.
- The encampment at 4th and Bancroft, which the City has scheduled for eviction, is marked by a red X.

3



*Figure 1*

### C. This Lawsuit

Plaintiffs filed this lawsuit on November 19, 2024. See Compl. (dkt. 1). They assert seven causes of action against the City: federal and state claims for exposure to state-created danger; federal and state claims for unlawful search and seizure; federal and state claims for discrimination against individuals with disabilities; and a federal claim for First Amendment retaliation. Id. Plaintiffs filed a motion for a temporary restraining order, which they assert is necessary due to the "atmospheric river" predicted to impact northern California in the coming days. Mot. for TRO at 1 (dkt. 6).

Plaintiffs are not clear as to exactly what emergency relief they seek. In their complaint, Plaintiffs request that the Court issue a temporary restraining order "to maintain the status quo." Compl. at 22. Presumably this means they seek an injunction to prevent the City from evicting them. Plaintiffs' complaint also seeks injunctive relief (though not in the form of a temporary restraining order) to "enjoin[] and restrain[]" the City from (1) "seizing and disposing of homeless individuals' property in a manner that violates" their constitutional rights, (2) "removing unhoused people from public property and seizing their property, in the absence of adequate housing or shelter, in violation" of their constitutional rights, and (3) "actions that discriminate against people with disabilities in the administration of [the City's] programs." Id. at 23. In Plaintiffs' proposed order



granting a temporary restraining order, however, they propose that the Court "restrain[] and enjoin[]" the City "from preventing plaintiffs and those who those plaintiff rely in the activities of daily living." Proposed Order (dkt. 6-8) at 2. Plaintiffs also suggest at times that they seek an order requiring the City to begin the interactive accommodation process so that their disabilities (which Plaintiffs allege prevent them from moving their tents) will be accommodated. Mot. for TRO at 2.

This uncertainty would ordinarily be grounds on its own to deny Plaintiffs' motion. See Maramag v. Wash. Mut. Bank, F.A., No. C 12-2156 PJH, 2012 WL 4051200, at *2 (N.D. Cal. Sept. 13, 2012) (denying motion for a temporary restraining order in part because "the court [could] not determine the nature of the specific relief sought by plaintiffs"). But because Plaintiffs bring this suit pro se, the Court construes their motion liberally as seeking an injunction that would prevent the City from in any way evicting Plaintiffs or removing their property. That, at least, is what the thrust of both parties' briefing is focused on.

Plaintiffs certified that they served their complaint and motion on the City at the City Clerk's Office. See Cert. of Service (dkt. 6-7). The City filed an opposition to the motion on November 19, 2024, and served its opposition on Plaintiffs. Opp. (dkt. 8); Shapp Decl. (dkt. 10) ¶ 5.

## II.  LEGAL STANDARD

A temporary restraining order is an "extraordinary remedy" that should be awarded only upon a clear showing that the party is entitled to such relief. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The party seeking relief must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. Id. at 20. Alternatively, if the party seeking relief demonstrates that "the balance of hardships tips sharply in [its] favor," it need only show that "serious questions going to the merits were raised" and that the other two Winter elements are satisfied. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (emphasis added)

1  (citation omitted).  Either way, "plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." Id. at 1131 (emphasis in original); see also adidas Am., Inc. v. Sketchers USA, Inc., 890 F.3d 747, 760 n.8 (9th Cir. 2018) ("it is the plaintiff's burden to put forth specific evidence from which the court can infer irreparable harm"); Flexible Lifeline Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 1000 (9th Cir. 2011) ("Harm must be proved, not presumed." (citation omitted)).

### III.  DISCUSSION

The Court finds that Plaintiffs have failed to prove that they are likely to suffer irreparable harm in the absence of emergency injunctive relief.  While this alone would resolve their motion for a temporary restraining order, the Court also finds that, at least on the current record, Plaintiffs have not made a showing of the other Winter elements.

#### A.  Irreparable Harm

Plaintiffs argue that they are likely to suffer irreparable harm because of the "atmospheric river" predicted to impact northern California in the coming days.  Mot. for TRO at 12.  As Plaintiffs explain, "[s]eizing disabled people[']s survival gear during a stormy system is likely to cause injury and physical distress." Id.  Plaintiffs further contend that because "the likelihood of injury or death is likely over 1%," Winter's irreparable harm element is satisfied. Id. (citing Roman v. Wolf, 977 F.3d 935, 944 (9th Cir. 2020)).[1]

The City does not contest Plaintiff's proposition that leaving unhoused, disabled individuals without shelter or other possessions during a potentially severe storm system would be likely to cause injury, distress, and potentially even death.  Rather, the City offers evidence that it has no intention of actually leaving Plaintiffs in this situation.  An

---

[1] The Court does not follow Plaintiffs' position that a 1% likelihood of serious injury is sufficient to meet Winter's requirement of showing irreparable harm.  Plaintiffs purport to rely on Roman v. Wolf, but the Ninth Circuit's decision states only that "Plaintiffs were likely to suffer irreparable harm absent relief given COVID-19's high mortality rate."  977 F.3d at 944.  Roman does not say anything about a 1% chance of injury or death from COVID-19, and Plaintiffs have not made the Court aware of judicially noticeable evidence to support their claim.  Nor, for that matter, have Plaintiffs supported their claim that the likelihood of serious injury or death from the "atmospheric river" is 1% or greater.

6

1   assistant to the City Manager disavows any plans by the City to remove Plaintiffs from
2   their places of residence. Radu Decl. ¶¶ 12, 15, 21. The notices that Plaintiffs attach to
3   their motion do not state that Plaintiffs will be evicted or removed, only that they are in
4   violation of City ordinances. Tayne Decl. Ex. A; Prado Decl. Ex. A; Fisher Decl. Ex. A.
5   Moreover, these notices expressly state that the City will <u>not</u> immediately discard shelter
6   items (such as tents, sleeping bags, and non-motorized methods of transportation). Tayne
7   Decl. Ex. A; Prado Decl. Ex. A; Fisher Decl. Ex. A. And the assistant to the City Manager
8   confirms that the City will provide physical assistance to help Plaintiffs and other
9   unhoused individuals move if they ask. Radu Decl. ¶¶ 11, 14, 20.

Plaintiffs do not offer any evidence in response. Prado stated that the City illegally towed her car at some point last year or earlier this year, Prado Decl. at 1, and Fisher said that at some undefined time she was "swept," meaning that she was evicted and that "[c]ity staff took all [her] belongings [and] didn't store anything," Fisher Decl. at 2. These isolated prior instances are not enough to establish that it is likely the City will evict Plaintiffs, take their property, and leave them subject to the impending atmospheric river. See Ctr. for Food Safety v. Vilsack, 636 F.3d 1166, 1173 (9th Cir. 2011) (lack of record evidence of "continuing, present adverse effects" precludes reliance on past events, even though "[p]ast harms can tend to show the threat of a repeated injury" (citations omitted)). Plaintiffs therefore fail to demonstrate a likelihood of imminent harm.[2]

### B.  Likelihood of Success on the Merits

Plaintiffs have not developed a record that establishes they are likely to succeed on the merits—that is, that they have "a 'fair chance' of success"—on any of their claims. Stewart v. City & County of San Francisco, 608 F. Supp. 3d 902, 911 (N.D. Cal. 2022).

---

[2] To be sure, Plaintiffs' failure to satisfy Winter's irreparable harm factor at this stage does not necessarily mean that Plaintiffs lack standing to bring their suit, especially because the Court's conclusion rests in large part on City officials' promise (though under oath) that they will not imminently enforce the City's ordinances against Plaintiffs. See Ind. Right to Life Victory Fund v. Morales, 66 F.4th 625, 631 (7th Cir. 2023) (explaining that "state officials' promises <u>not</u> to enforce a statute receive less weight" in determining whether plaintiffs have alleged a credible threat of enforcement (emphasis in original)).

**State-Created Danger.**  Plaintiffs allege that the City has acted with deliberate indifference by placing them in danger of the impending "atmospheric river."  Such a claim requires that the City have "affirmatively place[d] the plaintiff in a position of danger" by "creat[ing] or expos[ing] an individual to a danger which he or she would not have otherwise faced."  Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197, 201 (1989)).  These claims are not likely to succeed on the merits for the same reason that Plaintiffs have not shown a likelihood of irreparable harm—the City has no plans to evict Plaintiffs, so the City has not (and will not have) affirmatively placed them in danger.[3]

**Americans with Disabilities Act.**  Plaintiffs allege that the City has violated the ADA by refusing to accommodate them in two respects.  Specifically, Plaintiffs argue that the City should accommodate them (1) by allowing them to sleep in tents and (2) by not requiring them to relocate.  See Gilmore Decl. (dkt. 6-5), Ex. A (cease and desist letter).

The ADA provides that no qualified individual, as a result of their disability, shall "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Accordingly, state agencies must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 31.130(b)(7)(i).

Plaintiffs contend that the City has refused to engage in the accommodation process for so long that its delay constitutes a denial of accommodation.  See id. (citing Whitehead v. Pacifica Senior Living Mgmt. LLC, No. 31-15035, 2022 WL 313844, at *2 (9th Cir.

---

[3] Plaintiffs also bring a state-created danger claim under Article I, § 7(a) of the California Constitution.  Compl. ¶¶ 60–63.  But they do not address this claim in their motion for a temporary restraining order.  The same is true of Plaintiffs' California state law claim for discrimination based on disability, id. ¶¶ 81–84, and Plaintiffs' state and federal unlawful search-and-seizure claims, id. ¶¶ 64–72.  The Court therefore does not address whether Plaintiffs are have a fair chance of succeeding on any of these claims.

Feb. 2, 2022); Groome Res. Ltd., L.L.C. v. Parish of Jefferson, 234 F.3d 192, 197–98 (5th Cir. 2000); and McCray v. Wilkie, 966 F.3d 616, 621 (7th Cir. 2020)). But their own evidence establishes that the City was informed of Plaintiffs' need for accommodations on November 15, 2024—merely four days before they filed this motion for a temporary restraining order. That is not enough of a delay to assert an ADA violation, let alone to warrant emergency injunctive relief. See Whitehead, 2022 WL 313844, at *2 (no violation where the plaintiff received an accommodation "several weeks" after requesting it). So even if Plaintiffs' requested accommodations are all reasonable (of which the Court is skeptical), Plaintiffs have not shown that the City has discriminated against them by denying them a necessary accommodation.

**First Amendment Retaliation.** Plaintiffs assert that the City has unconstitutionally retaliated against specific encampments associated with the Where Do We Go? advocacy group. Mot. for TRO at 11. To make out a First Amendment retaliation claim, Plaintiffs must allege that (1) they "engaged in constitutionally protected activity," (2) the City's actions "would 'chill a person of ordinary firmness' from continuing to engage in the protected activity," and (3) the protected activity "was a substantial motivating factor" in the City's conduct. Ariz. Students' Ass'n v. Ariz. Bd. of Regents, 824 F.3d 858, 867 (9th Cir. 2016) (citation omitted). Their only evidence in support of this claim, however, is an assertion that the City has not issued notices to vacate or notices of violation to other encampments in Berkeley. See Gilmore Decl. ¶ 6. Without more of a record as to the various encampments and whether they are similarly situated, this evidence is not enough to establish a likelihood of success on the merits—especially in light of the City's position that it has no immediate plans to actually evict Plaintiffs or their encampments.

### C.     Balance of Equities and Public Interest

When, as here, the government is a party to the case, the remaining two Winter factors merge. Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014). Plaintiffs do not flesh out their argument for why these factors support a temporary restraining order, merely stating that "[a] narrow injunction can be issued that balances the

City's policy goals for public spaces, and the survival needs of Plaintiffs." Mot. for TRO at 12–13. The Court is therefore unable to find that these factors weigh in favor of emergency injunctive relief.

The City takes a more forceful position. It contends that these factors "tip strongly in the City's favor" because of purported efforts by homelessness activists to "bring[] unhoused people into conflict with the City to try to extract preferential rights to the public right of way and other public spaces." Opp. at 6. The City's evidence in support of this assertion is based on hearsay, however. See Radu Decl. ¶ 6 (quoting an article published in the Guardian, which in turn quotes unidentified encampment organizers). So on this limited record, the Court does not find that the balance of the equities and the public interest weigh against injunctive relief any more than in favor of it.

## IV. CONCLUSION

The Court finds that none of the Winter factors support granting a temporary restraining order. Accordingly, the Court **DENIES** Plaintiffs' motion.

**IT IS SO ORDERED.**

Dated: November 20, 2024

CHARLES R. BREYER
United States District Judge

10